Affirmed and Memorandum Opinion filed June 16, 2009








Affirmed and Memorandum Opinion filed June 16, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

 

 

NO. 14-08-00629-CR

____________

 

JABAR SMITH YOUNG, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 159th
District Court

Angelina County, Texas

Trial Court Cause No. CR-26,823

 



 

M E M O R A N D U M   O P I N I O N

Appellant,
Jabar Smith Young, was charged with two counts of aggravated sexual assault and
three counts of indecency by contact involving three young girls: Jane Doe 1,
Jane Doe 2, and Jane Doe 3.  Tex. Penal Code Ann. '' 21.11, 22.021 (Vernon 2003).  The jury found appellant guilty of each
count and sentenced him to ninety-nine years= confinement in the Institutional Division
of the Texas Department of Criminal Justice for each aggravated sexual assault
conviction and twenty years= confinement for each indecency with a
child conviction.  The
jury also imposed $10,000 fines for each conviction.  Appellant now
challenges the convictions on appeal.  We affirm.








Factual and Procedural Background

Jane
Does 1 and 3 are twin sisters.  Jane Doe 2 is a half-sister.  Jane Does 1 and 3
were nine years old when the sexual abuse occurred.  Jane Doe 2, who is a few
months younger than the twins, was eight.  At all times relevant to this
appeal, Jane Does 1 and 3 lived with their grandparents, Doris and James
Fears.  A sister, Decoya Amie, (frequently referred to as Dee) also lived with
the Fears.  During the relevant time period, Dee was a student in high school. 
Jane Doe 2 lived out of town, but would visit and stay overnight on weekends
and would stay for longer periods during summer vacation.  The Fears lived in a
three bedroom house: the twins in one bedroom, Dee in a second, adjoining
bedroom, and Mr. and Mrs. Fears in the third.

Appellant
is Mrs. Fears= nephew.  Appellant was twenty-three at the time of trial.  About three
years before the April 2008 trial Mr. Fears had knee surgery.  Mrs. Fears asked
appellant, who had recently moved back to Lufkin from Dallas, to come and help
take care of Mr. Fears while she took a trip.  Appellant continued to reside in
the Fears= house once Mr. Fears had recovered from the knee surgery.








In July
2006, Jan Wilkerson, a registered nurse, was making a series of presentations
at the Pine Woods Park Apartments.  Mr. Fears was the maintenance man at the
complex and he sometimes brought Jane Does 1 and 3 to work with him.  The twins
attended Ms. Wilkerson=s presentation on good touch/bad touch.  During the
presentation, Jane Doe 1 told Ms. Wilkerson: AI=ve been touched like that.@  This outcry led to a police
investigation that ultimately resulted in appellant being indicted on five
counts.  In count one appellant was charged with aggravated sexual assault of
Jane Doe 1 by causing the sexual organ or anus of Jane Doe 1 to contact
appellant=s sexual organ.  Tex. Penal Code Ann. ' 22.021(a)(1)(B)(iii) & (iv).  In
the second count, appellant was charged with aggravated sexual assault of Jane
Doe 2 by causing Jane Doe 2's anus to contact appellant=s sexual organ.  Id. at ' 22.021(a)(1)(B)(iv).  In count
three, appellant was charged with intentionally or knowingly engaging in sexual
contact with Jane Doe 1 by touching her breast.  Id. at ' 21.11(a)(1).  In count four,
appellant was charged with intentionally or knowingly engaging in sexual
contact with Jane Doe 2 by touching her breast.  Id.  Finally, in count
five, appellant was charged with intentionally or knowingly engaging in sexual
contact with Jane Doe 3 by touching her breast, sexual organ, or anus.  Id.

I.          The Evidence Introduced
During the Guilt-Innocence Phase of the Trial

Appellant=s trial commenced on April 16, 2008. 
The testimony is summarized below.

A.        The State=s Case 

1.         Jan Wilkerson

The
State=s first of numerous witnesses was Jan
Wilkerson, the designated outcry witness pursuant to article 38.072, Texas Code
of Criminal Procedure.  Wilkerson testified she is a registered nurse and in July
2006 she was doing a series of presentations at the Pine Woods Park
Apartments.  While doing the good touch/bad touch talk, one of the
participants, Jane Doe 1, tapped Wilkerson on her arm and said AI=ve been touched like that before.@

At the
end of the presentation Wilkerson took Jane Doe 1 into Ms. Peabody=s (a director at the apartments)
office.  She then talked to Jane Doe 1 along with Ms. Peabody.  After a few
minutes, Jane Doe 1 revealed that her cousin, Jabar Young, had touched her
several times and fondled her breasts at least three times.  Jane Doe 1 was
unable to remember dates.  Jane Doe 1 also revealed appellant had touched her
twin sister as well as another sister.  Jane Doe 1 was very frightened while
talking and kept saying she would get in trouble.

Wilkerson
then took Jane Doe 1 out of the room, brought in and then talked to her twin
sister, Jane Doe 3.  After a few minutes, Jane Doe 3 revealed appellant had
touched her.








Neither
Jane Doe 1 or 3 could specify any dates the incidents occurred.  Wilkerson
testified this is not uncommon for children the age of Jane Does 1 and 3. 
Wilkerson also testified being frightened while recounting the incidents is not
uncommon.  Finally, Wilkerson testified she then reported the incident to the
police and did not deal with the girls again.

2.         Stacey Hamilton

Stacey
Hamilton is a registered nurse at Woodland Heights Medical Center.  She is one
of the SANE (Sexual Assault Nurse Examiner) nurses at the hospital.

On
August 2, 2006, Hamilton examined Jane Doe 2, who was nine at the time.  Jane
Doe 2 told Hamilton she would visit and stay at her grandmother=s house on weekends.  When Jane Doe
2's grandmother left the house, she would have AJoeboy@ watch them.  At this point, Hamilton
testified Jane Doe 2 became tearful and very afraid.  Jane Doe 2 told Hamilton AJoeboy@ would lay on her and put something
in her anus.  He never threatened her, but told her sisters if they told he
would kill them.  Jane Doe 2 identified AJoeboy@ as appellant.  Jane Doe 2 was not
able to pinpoint any dates.  According to Hamilton, Jane Doe 2 said the abuse
had been going on since last year, had happened about five times, maybe more,
and usually occurred during the night.

Following
her interview of Jane Doe 2, Hamilton performed a physical examination. 
Hamilton testified that, because of Jane Doe 2=s age, she only performed a visual
inspection of Jane Doe 2=s  genitalia, which revealed a normal vaginal area.  When
tested, Jane Doe 2=s rectum dilated quickly which, according to Hamilton, raises
questions as to why and is some indication there has been sexual abuse. 
However, Hamilton testified rapid rectal dilation is not definitive evidence
there has been sexual abuse.  Hamilton also testified injuries caused by sexual
assault heal very quickly, often within twenty-four hours, thus Jane Doe 2's
normal vaginal result does not mean Jane Doe 2 had not been sexually abused.








The next
day Hamilton examined Jane Does 1 and 3.  They were nine at the time of the
examination.

Hamilton
first interviewed and examined Jane Doe 1.  According to Hamilton, Jane Doe 1
described multiple assaults by appellant, including insertion into the vagina
and anus.  Jane Doe 1 said the assaults happened at least ten times.  The
physical exam showed Amultiple notches in her hyman@ and obvious scarring.  According to
Ms. Hamilton, these were not normal findings and were consistent with Jane Doe
1's sexual assault history.  Hamilton took photographs of Jane Doe 1's
genitalia showing the notches and scarring and these photographs were admitted
into evidence.

Next,
Hamilton interviewed and examined Jane Doe 3.  During the interview, Jane Doe 3
described multiple incidents of abuse by appellant, including penetration of
the vagina and anus.  The physical exam showed physical signs consistent with
sexual assault.  As part of her physical exam of Jane Doe 3, Hamilton took
photographs of Jane Doe 3's genitalia and these were admitted into evidence.

On
cross-examination Hamilton testified she could not put a time frame on when the
injuries occurred.  Also, Hamilton testified she could not say 100% positively
that this was caused by the sexual abuse of appellant.  According to Hamilton,
neither twin mentioned a threat to kill by appellant.

3.         David ABuddy@ Cross

David
Cross is a detective with the Lufkin Police Department with over 350 hours of
advanced training in child physical and sexual abuse.  Detective Cross was one
of the police investigators assigned to this case.








Detective
Cross testified that, during one of the victim interviews at the Child Advocacy
Center, the child mentioned the actor had ejaculated on a particular comforter
in Dee=s bedroom.  The police then recovered
a purple comforter from Dee=s bedroom.  Detective Cross obtained DNA samples from the
three complainants and appellant.  Detective Cross turned the evidence over to
the officer in charge of the Lufkin Police property room and she forwarded the
comforter and DNA samples to the Department of Public Safety (ADPS@) crime lab in Houston, Texas.

Finally,
Detective Cross testified that, as part of his investigation, he met with
appellant, who appeared voluntarily.  According to Detective Cross, appellant
denied the accusations.

4.         Tanya Dean

Tanya
Dean testified she is a forensic scientist assigned to the DPS crime lab in
Houston.  Dean received the comforter from the Lufkin Police as well as the DNA
swabs.  Dean initially checked the comforter for stains and testified she observed
a total of eighty-six stains.  Dean then narrowed the eighty-six stains down to
twelve possible semen stains.  Dean confirmed semen on two, stains A and B. 
According to Dean, the remaining stains were apparent semen (i.e.
unconfirmed).  Dean then explained she narrowed the number down from the
eighty-six by testing for acid phosphatase, which, according to Dean, is
present in large quantity in semen.  Dean testified that, because she was not
certified in DNA testing at that point in time, she could not perform the DNA
testing on the comforter stains or the DNA samples.

5.         Christy Smejkal

Christy
Smejkal testified next.  Smejkal testified she is a forensic scientist with the
DPS crime lab in Houston.  Smejkal extracted DNA from three comforter cuttings:
A, B, and C.  Smejkal then testified she found sperm and epithelial (skin)
cells on all three.  Smejkal then testified that, in her opinion, the DNA
profile from the sperm found on all three stains is consistent with that of
appellant.  She therefore concluded appellant was the sperm contributor.








Smejkal
then testified she examined the skin cells from the three stains.  According to
Smejkal, Stain A contained a mixture of DNA profiles and she could not exclude
Jane Doe 1 or appellant as contributors.  Smejkal=s examination of Stain B revealed a
mixture of DNA profiles.  According to Smejkal, she could not exclude any of
the Jane Does as contributors, but she could make no conclusion beyond that. 
As far as Stain C, Smejkal testified it was a mixture of DNA as well.  Smejkal
testified appellant could not be excluded and she concluded appellant was a
major contributor.  However, Smejkal testified she excluded all three Jane Does
as contributors to the skin cells found in Stain C.

Smejkal
further testified that since the stains are semen stains, it is likely the skin
cells came from a sexual encounter rather than as a result of a random mixing
(i.e. the skin cells were already on the comforter, and sperm then landed on
top of the skin cells).

On
cross-examination Smejkal testified that, as a result of the DNA from the skin
cells, she could not positively conclude any of the Jane Does were contributors
to the skin cells found in Stains B and C.  As far as Stain A, Smejkal
testified she could not exclude Jane Doe 1 as a contributor to the skin cells,
but there were also cells from others, more than two contributors.  According
to Smejkal, the normal method skin cells get in a semen stain is the liquid
gathers the skin cells and then transports the skin cells onto the surface. 
Smejkal could not  confirm how Jane Doe 1's skin cells got in Stain A, but it
is a semen stain.

Finally,
Smejkal testified the remaining nine out of the twelve semen stains remain  in
freezer storage at the DPS lab.  Smejkal testified she elected not to test the
nine remaining samples.  According to Smejkal, it is the analyst=s discretion or decision on how many
samples to test.

6.         Jane Doe 2








Jane Doe
2 was ten at the time she testified.  Jane Doe 2 lives with her mother. 
Appellant is her cousin.  She has twin sisters, who live with their
grandmother.  Jane Doe 2 testified appellant would Amess with her@ when she was staying at her
grandmother=s place.  According to Jane Doe 2, appellant did it three or four times. 
Jane Doe 2 then described the incidents: appellant would pull his pants down
and then pull down Jane Doe 2's pants. Appellant would put lotion on her bottom
and would get on top of her while she was lying on her stomach.  According to
Jane Doe 2, these incidents happened in the twins= bedroom as well as in Dee=s.  Jane Doe 2 testified Dee had a
purple comforter on her bed and the incidents sometimes occurred on top of that
comforter.  Jane Doe 2 also testified she saw appellant leave a stain on the
comforter when he was on top of Jane Doe 3.  Jane Doe 2 testified she saw
appellant do bad things to Jane Doe 3 twice.  Jane Doe 2 testified she did not
remember the exact dates of any of the incidents.

On
cross-examination Jane Doe 2 testified appellant slept in Dee=s room if she was not there,
otherwise, he slept on the couch in the living room.  She also testified that
most of the incidents happened at night, but a couple occurred during the day. 
During the daytime incidents, only appellant and the Jane Does were home.  At
night, Jane Doe 2's grandparents were there in the house.  According to Jane
Doe 2, Jane Doe 1 has to use lotion on a daily basis for skin problems.  Jane
Doe 2 saw appellant get Jane Doe 3 when Jane Doe 3 was drying off after a bath
and appellant then took Jane Doe 3 into Dee=s room.

7.         Jane Doe 1








Jane Doe
1 was eleven at the time of trial.  Jane Doe 1 testified appellant is her
cousin and was living with her grandparents at the time of the incidents.  Dee
was also still living at home at the time of the incidents.  Jane Doe 1
testified she told the nurse at the Pine Woods Park Apartments about what
happened.  According to Jane Doe 1, appellant touched her on her breast and her
bottom with his hand.  Appellant also touched Jane Doe 1's bottom with his
private part (Jane Doe 1 indicated this by circling an area on a drawing of a
male which was admitted into evidence).  Jane Doe 1 referred to her genital
area as her private part.  Jane Doe 1 could not remember if appellant had
touched her private part with his private part.

According
to Jane Doe 1, when Dee was home, appellant would stay in the twins= room and sleep at the end of the
bed.  The incidents occurred in both the twins= room as well as in Dee=s room.  Jane Doe 1 saw white stuff
come out of the appellant=s private part, and she saw it a lot.

Jane Doe
1 also testified appellant never threatened her, but that he did tell her they
would get in trouble if the girls told anyone.  She did not remember the dates
the incidents occurred, but they happened a lot.

Finally,
Jane Doe 1 testified she saw appellant touch both Jane Doe 2 and Jane Doe 3 on
their bottoms with his private part.  She also saw appellant touch Jane Doe 3's
breasts but she was not sure if appellant touched Jane Doe 3's private part
with his private part.

On
cross-examination Jane Doe 1 stated that while most of the incidents occurred
at night, some occurred during the daytime.  According to Jane Doe 1, appellant
used lotion during the incidents and she confirmed she has to put lotion on her
skin. Finally, she testified that while appellant did not stay at her
grandparents= house every night, he was there most nights.

8.         Jane Doe 3

Jane Doe
3 was eleven when she testified.  Jane Doe 3 testified appellant touched her in
a bad way.  Jane Doe 3 testified appellant stayed in the twins= bedroom at the end of the twins= bed.

Jane Doe
3 testified she woke up one night and saw appellant=s front touching Jane Doe 2.  She
also saw appellant use his hand to touch Jane Doe 2's private part as well as
her breasts.  According to Jane Doe 3, this happened more than once, and always
at night.








Jane Doe
3 testified appellant touched her private part with his private part. 
According to Jane Doe 3, this happened more than once and it occurred in the
twins= bedroom as well as one time in Dee=s room.  According to Jane Doe 3,
this was the incident when appellant grabbed her when she got out of the
bathtub.  During the incidents, Jane Doe 3 would lie on her stomach and
appellant would touch her bottom and private part with his private part. 
Appellant also touched her breasts with his hand and this happened multiple
times.

Jane Doe
3 also testified she saw appellant touch Jane Doe 2's breast with his hand.

Finally,
Jane Doe 3 testified appellant did not threaten her, and she did not hear
appellant threaten Jane Does 1 or 2 either.

9.         David ABuddy@ Cross

Detective
Cross took the witness stand again and testified that, when he retrieved the
purple comforter from Dee=s room, there were no fresh stains on it, just dry.  The
initial report of the incidents was made on July 26, 2006.  In response to
questions regarding how the indictment date of April 15, 2006 was selected,
Cross testified that during the video interviews at the Child Advocacy Center,
the victims said the assaults occurred two to three months prior to the
interviews, on a weekend.  Cross then calculated three months prior, on a
Saturday, and this worked out to be April 15, 2006.

Following
Detective Cross= testimony, the State rested its case in chief.

B.        Appellant=s Evidence:

1.         Doris Fears








Mrs.
Fears explained why appellant was living at her house in the spring and summer
of 2006.  She also testified the twins had been living with them since they
were six.  According to Mrs. Fears, eventually, during 2006, the twins told her
they wanted appellant to move out of the house.  On cross-examination, Mrs.
Fears testified that since the incidents were reported the girls have
consistently maintained it was appellant who abused them.  Fears also testified
she believed the accusations were true.

2.         Jabar Young

Appellant
testified in his own defense.  Appellant denied abusing the three girls. 
Appellant also explained that his sperm got on Dee=s purple comforter because he had sex
with his girlfriend in Dee=s room when no one else was present in the Fears= home.  Appellant denied that Jane
Doe 2 stayed overnight while he was staying at the Fears= house.  Appellant also denied he
stayed most nights at the Fears= house.  Instead, appellant testified he spent most evenings
at his girlfriend=s place.  Appellant testified that when he slept at the Fears= house,  he slept on the couch, not
in the twins= bedroom.  Appellant also admitted he knew the twins told Mrs. Fears they
were ready for him to move out.  In appellant=s view, the twins were jealous
because he got all of the attention from everybody.

On
cross-examination, appellant had no idea how, if no one else was home when he
had sex with his girlfriend, Jane Doe 2 could tell the police there would be
semen on the purple comforter.  Appellant argued he was the victim of a
conspiracy by three nine year old girls to get him out of the house.

C.        State=s Rebuttal

On
rebuttal, Detective Cross testified that Jane Doe 2, during the interview at
the Child Advocacy Center (which he observed through a closed circuit),
revealed she had seen white stuff come out of appellant onto the purple
comforter in Dee=s room.  The only people in the interview room were Jane Doe
2 and the interviewer.

II.        The Charge Conference and
Jury Charge








At the
close of the evidence appellant filed a motion asking the trial court to force
the State to elect not only which specific conduct they were proceeding on
under each count but to elect between night and day as well.  The State
voluntarily made an election as to the conduct on Counts I, IV, and V.  With
regard to Counts II and III, the State asserted no election was needed because
there was only one allegation as to each sexual organ in Count II and breast in
Count III.  Appellant=s trial counsel agreed.[1] 
Following these voluntary elections, the State argued it was not required to
make the requested election between day and night.  The trial court agreed and
denied appellant=s motion seeking that election.  The trial court then
prepared a jury charge on all five counts:

Count I:          [O]n or about the 15th day of April,
2006, ... [appellant], did then and there intentionally or knowingly cause the
sexual organ of Jane Doe 1 ... to contact the sexual organ of [appellant] ....

Count II:         [O]n or about the 15th day of April,
2006, ... [appellant], did then and there intentionally or knowingly cause the
sexual organ of Jane Doe 2 ... to contact the sexual organ of [appellant] ....

Count III:        [O]n or about the 15th day of April,
2006, ... [appellant], ... with the intent to arouse or gratify the sexual
desire of [appellant], intentionally or knowingly engage in sexual contact with
Jane Doe 1, by touching the breast of Jane Doe 1 ....

Count IV:        [O]n or about the 15th day of April,
2006, ... [appellant], ... with the intent to arouse or gratify the sexual
desire of [appellant], intentionally or knowingly engage in sexual contact with
Jane Doe 2 by touching the breast of Jane Doe 2 ....

Count V:         [O]n or about the 15th day of April,
2006, ... [appellant], ... with the intent to arouse or gratify the sexual
desire of [appellant], intentionally or knowingly engage in sexual contact with
Jane Doe 3 by touching the breast of Jane Doe 3 ....








The jury
charge also included the following instruction:

AYou are instructed that the State is not bound by the date
alleged in the indictment but to prove that the offense was committed any time
prior to the return of the indictment that is within the period of limitation.@

The jury
found appellant guilty of each count and sentenced him to ninety-nine years= confinement in the Institutional Division
of the Texas Department of Criminal Justice for each aggravated sexual assault
conviction and twenty years= confinement for each indecency with a
child conviction.  The
jury also imposed a $10,000 fine for each count.  This appeal followed.

Discussion

Appellant
brings eight issues on appeal, which can be grouped into three general
categories.  Issues 1 through 4 challenge the legal and factual sufficiency of
the evidence supporting the Counts I (aggravated sexual assault of Jane Doe 1)
and IV (sexual contact with Jane Doe 2) convictions.  Issues 5 through 7 argue
the trial court erred in denying appellant=s  motion for election (night or
daytime) as to Counts II, III, and V.  Finally, Issue 8 contends the trial
court erred when it denied appellant=s motion for mistrial after the
prosecutor argued outside the record during closing argument.

I.          Is the evidence legally
and factually sufficient?

A.        The Standard of Review








In a legal sufficiency review, we view all the evidence in
the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct.
2781, 2789, 61 L.Ed.2d 560 (1979); Salinas v. State, 163 S.W.3d 734, 737
(Tex. Crim. App. 2005).  The jury, as the sole judge of the credibility of the
witnesses, is free to believe or disbelieve all or part of a witness= testimony.  Jones
v. State, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998).  The jury may
reasonably infer facts from the evidence presented, credit the witnesses it
chooses to, disbelieve any or all of the evidence or testimony proffered, and
weigh the evidence as it sees fit.  Sharp v. State, 707 S.W.2d 611, 614
(Tex. Crim. App. 1986).  Reconciliation of conflicts in the evidence is within
the jury=s discretion, and
such conflicts alone will not call for reversal if there is enough credible
evidence to support a conviction.  Losada v. State, 721 S.W.2d 305, 309
(Tex. Crim. App. 1986).  An appellate court may not re-evaluate the weight and
credibility of the evidence produced at trial and in so doing substitute its
judgment for that of the fact finder.  King v. State, 29 S.W.3d 556, 562
(Tex. Crim. App. 2000).  Inconsistencies in the evidence are resolved in favor
of the verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App.
2000).    We do not engage in a second evaluation of the weight and credibility
of the evidence, but only ensure the jury reached a rational decision.  Muniz
v. State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); Harris v. State,
164 S.W.3d 775, 784 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).

In a factual sufficiency review, we consider all the
evidence in a neutral light.  Prible v. State, 175 S.W.3d 724, 730-31
(Tex. Crim. App. 2005).  The evidence may be factually insufficient in two
ways.  Id. at 731.  First, when considered by itself, evidence
supporting the verdict may be so weak the verdict is clearly wrong and
manifestly unjust.  Id.  Second, where the evidence both supports and
contradicts the verdict, the contrary evidence may be strong enough the
beyond-a-reasonable-doubt standard could not have been met.  Id.  In
conducting a factual sufficiency review, we must employ appropriate deference
so we do not substitute our judgment for that of the fact finder.  Jones v.
State, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996).  Our analysis must consider
the evidence appellant claims is most important in allegedly undermining the
jury=s verdict.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App.  2003).








B.        The evidence supporting the
Count I conviction is legally and factually sufficient

A person
commits aggravated sexual assault of a child if the person intentionally or
knowingly causes the sexual organ of a child to contact or penetrate the sexual
organ of another person and the child is younger than 14 years of age.  Tex.
Penal Code Ann. ' 22.021(a)(1)(B)(iii), (a)(2)(B). 

With
regard to Count I, in his brief appellant focused only on the testimony of Jane
Doe 1 and the fact she testified during the trial that she could not remember
if appellant=s private part had touched her private part.  In making this argument,
appellant overlooks the other evidence in the record, including the testimony
of Stacey Hamilton, the SANE nurse who testified regarding (1) Jane Doe 1's
description of appellant=s sexual organ contacting her sexual organ, and (2) the
medical evidence indicating Jane Doe 1 had been sexually assaulted.  Viewing
this evidence in a light most favorable to the verdict, we conclude a rational
jury could have found the elements of aggravated sexual assault of a child
beyond a reasonable doubt.  Accordingly, we hold the evidence supporting the
conviction on Count I is legally sufficient.  Jensen v. State, 66 S.W.3d
528, 533B34 (Tex. App.CHouston [14th Dist.] 2002, pet. ref=d).  As the evidence is legally
sufficient to support appellant=s Count I conviction, we overrule appellant=s first issue on appeal.








With
regard to the factual sufficiency of the evidence supporting Count I, appellant
once again focuses exclusively on Jane Doe 1's testimony that she could not
remember if appellant=s private part had touched her private part.  In making this
argument, appellant again overlooks the other evidence in the record
highlighted above.  The jury heard all of this evidence, considered the
inconsistencies, if any, and still determined appellant was guilty of
aggravated sexual assault of Jane Doe 1.  Considering all of the evidence in
the case in a neutral light, and deferring to the jury=s role as the sole judge of the weight and credibility given
to the witnesses= testimony, we cannot conclude that the contrary evidence
pointed out by appellant is strong enough that the beyond-a-reasonable-doubt
standard could not have been met.

As the evidence is factually sufficient to support
appellant=s Count I conviction, we overrule appellant=s third issue.

C.        The evidence supporting the
Count IV conviction is legally and factually sufficient

In his
second and fourth issues, appellant argues the evidence is legally and
factually insufficient to support the Count IV conviction because the only
evidence was Jane Doe 3's testimony that she saw appellant touch Jane Doe 2's
breast.  We disagree.

A
criminal conviction may be supported by the testimony of a single witness.  Aguilar v. State, 468 S.W.2d 75,
77 (Tex. Crim. App. 1971); Walker v. State, 180 S.W.3d 829, 832 (Tex.
App.CHouston [14th
Dist.] 2005, pet. ref=d).  Therefore, viewing the evidence in
the light most favorable to the verdict, we hold the evidence supporting the
Count IV conviction is legally sufficient.  We overrule appellant=s second issue.

In his fourth issue, appellant asserts that since there was
only one witness who testified she saw appellant touch Jane Doe 2's breast, the
evidence supporting the Count IV conviction is so weak the verdict is clearly
wrong and manifestly unjust.  Here, the jury heard Jane Doe 3's testimony
describing how appellant touched Jane Doe 2's breast and determined appellant
was guilty of indecency with a child.  Considering all of the evidence in the
case in a neutral light, and
deferring to the jury=s role as the sole judge of the weight and credibility given
to the witnesses= testimony, we cannot conclude the evidence is so weak the verdict
is clearly wrong and manifestly unjust.  Therefore, we hold the evidence supporting the Count IV
conviction is factually sufficient.  We overrule appellant=s fourth issue.








II         Was appellant harmed as a
result of the trial court denying his motion to force the State to elect
between night and daytime offenses?

In
issues five through seven, appellant contends the trial court reversibly erred
when it denied his motion for election between night and daytime offenses for
Counts II, III, and V.  Assuming without deciding appellant preserved these
issues for appellate review, and the trial court erred when it denied appellant=s motion to elect, we hold the error
was harmless.

The general
rule is Awhere one act of intercourse is
alleged in the indictment and more than one act of intercourse is shown by the
evidence in a sexual assault trial, the State must elect the act upon which it
would rely for conviction.@  O=Neal v. State, 746 S.W.2d 769, 771 (Tex. Crim.
App. 1988).  Once the State rests its case in chief, in the face of a timely
election request by the defendant, the trial court must order the State to make
its election.  Id. at 772.  Failure to do so constitutes error.  Id. 
There are four reasons for the election rule: (1) to protect the accused from
the introduction of extraneous offenses, (2) to minimize the risk that the jury
might choose to convict, not because one or more crimes were proved beyond a
reasonable doubt, but because all of them together convinced the jury the
defendant was guilty, (3) to ensure unanimous verdicts, that is, all of the
jurors agreeing that one specific incident, which constituted the offense
charged in the indictment, occurred, and (4) to give the defendant notice of
the particular offense the State intends to rely upon for prosecution and
afford the defendant an opportunity to defend.  Dixon v. State, 201
S.W.3d 731, 733 (Tex. Crim. App. 2006).  Election error is analyzed under the
harm standard applicable to constitutional errors.  Id. at 734.  

In Dixon,
a case with remarkably similar facts, the Court of Criminal Appeals addressed
each of the four reasons for the election rule and held there was no harm when
the trial court denied the defendant=s motion to force the State to elect
the specific offense it was relying on for conviction.  See id.
at 734B36.








Citing
Article 38.37 of the Code of Criminal Procedure, the Court of Criminal Appeals
dispensed with the first purpose because a defendant is not entitled to be
protected from the admission of evidence of extraneous sexual offenses
committed by the defendant against the child.  Id. at 734.

In
addressing the second purpose, the court found the case was

not
concerned with evidence of different activities from different sources that a
jury might perceive to add up to the defendant being guilty even though no
individual offense was proven beyond a reasonable doubt.  Moreover, the child
complainant did not testify about a number of varied incidents with differing
details that might have incrementally added to the idea that the defendant must
have done something to provoke the plethora of stories about his activities. 
Rather, the child articulated one sequence of events and merely answered that
this sequence happened one hundred times, with all but one of those instances
occurring at night.  The child was either credible in giving this unified
account or she was not.

Id. at 735.

The
Court of Criminal Appeals also determined there was no risk that the case led
to a non-unanimous verdict simply because the child complainant testified one
incident occurred during the day while the remaining ninety-nine occurred at
night.  Id.  The court continued, Ait is obvious from this record that
anyone who believed the complainant=s allegations in any respect would
believe that sexual assaults occurred at night.@  Id.  Finally, the court
concluded Aclearly, . . . the jurors unanimously agreed that appellant committed at
least one sexual assault, at night, sometime during the year, in the manner described
by the complainant.@  Id. n.23.








Finally,
noting time of day is not usually an essential element of a criminal offense,
the Court of Criminal Appeals held the defendant was not deprived of notice
simply because the child complainant testified one out of the one hundred
incidents occurred during the day.  Id. at 736.  The court warned, where
young children are involved, courts cannot impose unrealistic expectations
regarding proof of when an offense actually occurred.  Id.  The court
then held that, Awithout more, a variance in the time of day is not a basis
for claiming lack of notice.@  Id.

Because
we perceive no legally significant differences between the facts of the present
case and Dixon, we hold, beyond a reasonable doubt, the trial court=s denial of appellant=s motion to force the State to elect
between night and day offenses did not contribute to appellant=s conviction or punishment.  See
id.  Therefore, we overrule appellant=s fifth, sixth, and seventh issues.

III.       Did the trial court err
when it denied appellant=s motion for mistrial after the
prosecutor argued outside the record during closing argument?

In his
final issue on appeal, appellant complains of the following argument by the
prosecutor:

First of
all, with respect to the DNA, I want to tell you, first of all, that the lab
did come in and tell me the day they were here to testify, they had nine other
samples.  I was under the impression that they had only three and I didn=t find out about it until she got to my office and
said there were nine others.  In fact, we had the discussion about that, and
said, AWell, how is anybody supposed to --@

At that point, appellant=s counsel objected as outside the
record.  The trial court sustained the objection: AI=ll sustain.  Ladies and gentlemen,
you=re only to consider what=s evidence presented under oath under
my rulings or exhibits.  You may continue.@  Appellant then requested a
mistrial, which the trial court denied.

Appellant
contends the trial court erred when it denied his motion for mistrial.  The
State points out appellant did not request an instruction to disregard and
argues appellant waived this issue on appeal because the alleged error was of
the type that could have been corrected by such an instruction.  We agree with
the State.








Improper
jury arguments include references to facts not in evidence.  Phillips v.
State, 130 S.W.3d 343, 355 (Tex. App.CHouston [14th Dist.]), aff=d, 193 S.W.3d 904 (Tex. Crim. App. 2006).  Almost any
improper argument may be cured by an instruction to disregard.  Newby v.
State, 252 S.W.3d 431, 438 (Tex. App.CHouston [14th Dist.] 2008, pet. ref=d).  Even when a prosecutor mentions
facts outside the record during argument, an instruction to disregard will
generally cure the error.  Martinez v. State, 17 S.W.3d 677, 691 (Tex.
Crim. App. 2000).  A mistrial is the trial court=s remedy for improper conduct that is
so prejudicial that expenditure of further time and expense would be wasteful
and futile.  Newby, 252 S.W.3d at 438.  A party that fails to request an
instruction to disregard will have forfeited appellate review of that class of
events that could have been cured by such an instruction.  Young v. State,
137 S.W.3d 65, 70 (Tex. Crim. App. 2004).

Here,
the prosecutor=s argument did mention a fact outside the record: the prosecutor=s knowledge of the number of semen
samples taken from the purple comforter that were not tested for DNA and a
discussion he allegedly had with the analyst.[2] 
However, appellant=s counsel promptly objected and the objection was sustained
cutting off any further comment by the prosecutor on this subject.  Appellant
did not request an instruction to disregard, however, the trial court did
instruct the jury to consider only the admitted evidence.  Appellant then
requested a mistrial, which the trial court denied.  We hold this improper jury
argument could have been corrected by an instruction to disregard, however,
appellant did not request that instruction.  Accordingly, appellant failed to
preserve appellate review of this issue.  See id. at 71B72.  We overrule appellant=s eighth issue.

 








Conclusion

Having overruled each of appellant=s issues on
appeal, we affirm the trial court=s judgment.

 

/s/      John S. Anderson

Justice

 

 

 

 

Panel consists of
Justices Anderson, Seymore and Guzman.

Do Not Publish C Tex. R. App. P.
47.2(b).

 

 









[1]  The exact language during the charge conference was:

 

THE COURT: All right.  Count II is already -- it was
only one item anyway, so it=s good to go,
is it not?

[PROSECUTOR]: I think so, Your Honor.

[DEFENSE COUNSEL]: That=s my review.  Look at -- it says Aanus@ on the third line.  Go to the fifth line.  Okay. 
That=s correct.  It is correct.  It=s right.

THE COURT: All right.  Then Count III --

[PROSECUTOR]:  -- I don=t think requires an election.

[DEFENSE
COUNSEL]: I agree.





[2]  According to Christy Smejkal, the DPS analyst,
twelve semen samples were found and taken from the comforter.  However, she
testified she decided to only test three of those samples.